

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-1999

# Inter Med Sup Ltd v. EBI Medical Syst., et.al.

Precedential or Non-Precedential:

Docket 98-5158

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Inter Med Sup Ltd v. EBI Medical Syst., et.al." (1999). *1999 Decisions.* Paper 171.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/171

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 28, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5158

INTER MEDICAL SUPPLIES, LTD.

v.

EBI MEDICAL SYSTEMS, INC.;
ELECTRO-BIOLOGY, INC.;
BIOMET, INC.

v.

ORTHOFIX, LTD.
ORTHOFIX INTERNATIONAL, N.V.

(D.C. Civil No. 95-06035)

ORTHOFIX, INC.;
ORTHOFIX S.R.L.

v.

EBI MEDICAL SYSTEMS, INC.;
ELECTRO-BIOLOGY, INC.;
BIOMET, INC.

(D.C. Civil No. 96-01047)

EBI MEDICAL SYSTEMS, INC.;
ELECTRO-BIOLOGY, INC.;
BIOMET, INC.,
        Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 95-cv-06035)
District Court Judge: Stephen M. Orlofsky

Argued October 29, 1998

Before: SLOVITER, GARTH, and MAGILL,*
Circuit Judges

(Filed June 28, 1999)

        Donald R. Dunner
        Griffith B. Price, Jr.
        Don O. Burley
        Jeffrey B. Chasnow
        Howard A. Kwon
        Richard L. Rainey
        Finnegan, Henderson, Farabow,
         Garrett & Dunner
        Washington, D.C. 20005

        John J. Gibbons (Argued)
        David Fernandez
        Paul M. Hauge
        Gibbons, Del Deo, Dolan, Griffinger
         & Vecchione
        Newark, N.J. 07102

        Arthur P. Kalleres
        Thomas E. Hixdorf
        Ice Miller Donadio & Ryan
        Indianapolis, Ind. 46282

         Attorneys for Appellants

        Joel Schneider
        Archer & Greiner
        Haddonfield, N.J. 08033

        Dennis P. Orr
        Scott Mortman
        Mayer, Brown & Platt
        New York, N.Y. 10019
_____

* The Honorable Frank J. Magill, of the United States Court of Appeals
for the Eighth Circuit, sitting by designation.

Stephen J. Marzen (Argued)
Wendy E. Ackerman
Reginald R. Goeke
Meredith Kolsky Lewis
Roopal R. Shah
Shearman & Sterling
Washington, D.C. 20004

 Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Following a lengthy trial, a jury found for plaintiff companies on all of the breach of contract and tort claims submitted to it and it returned a verdict of $48 million in compensatory damages and more than $100 million in punitive damages. The District Court denied the defendants' motions for judgment as a matter of law or for a new trial but granted a remittitur reducing the award of punitive damages to $50 million. Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 975 F. Supp. 681, 685 (D.N.J. 1997). On appeal, defendants focus on certain of the bases for recovery, but, understandably, direct their most vigorous critique to the sizable damages awards, primarily that for punitive damages. The role of gatekeeper over such punitive damages verdicts is one of the most challenging that has been placed upon appellate judges in civil cases.

I.

FACTS

A.

BACKGROUND

Orthofix S.r.l., an Italian company, manufactures medical devices, including a product known as an external bone

fixator, which is used to hold severely fractured bones in alignment, thereby obviating the need for repeated surgery. It is wholly owned by Orthofix, N.V. of the Netherlands, which itself owns Inter Medical Supplies, Ltd., a Cyprus-based company that is the worldwide distributor of the Orthofix bone fixators. These entities will be referred to collectively as "Orthofix."

Biomet, Inc., an Indiana company, manufactures orthopedic devices and owns Electro-Biology, Inc. Electro-Biology in turn owns EBI Medical Systems, Inc., a New Jersey-based corporation that sells external bonefixators. These entities will be referred to collectively as "EBI."

Beginning in 1983, EBI and Orthofix entered into a series of distributor agreements pursuant to which EBI served as the exclusive distributor in the United States, Canada, and the Caribbean Basin for various orthopedic devices, principally external bone fixators, manufactured by Orthofix. The last of these agreements went into effect on June 1, 1990, and expired on May 31, 1995 (the "Distributor Agreement"). For some eleven years, EBI and Orthofix shared what each agrees was a profitable business relationship, grossing approximately $30 million in sales annually and controlling one-third of the United States bone fixators market.

The present dispute arises out of the 1990 Distributor Agreement between the parties. Under paragraph 8 of the Agreement, Orthofix agreed to promptly supply EBI with "such quantities of the products as [were] ordered from time to time." In turn, EBI agreed under paragraph 6(k) to "maintain in its inventory, at all times, a quantity of Products reasonably necessary to meet [EBI's] resale requirements for at least two months." In paragraphs 6(f) and (g), EBI agreed to distribute and sell Orthofix's products in conjunction with the Orthofix trade name, but promised not to appropriate that name as part of its own corporate designation. Both parties agreed not to disclose proprietary information obtained from the other.

Finally, EBI consented to restrictions on its ability to deal in competitive products. Specifically, in paragraph 6(d) EBI undertook

4

> not to distribute, sell, promote the sale of, or in any
> way handle during the term of this Agreement and for
> one (1) year after its early termination by EBI any
> product which could reasonably be deemed competitive
> with the [Orthofix] Products.

Despite the excellent results from their mutual efforts, the business relationship between EBI and Orthofix deteriorated during the last year of the June 1990 Distributor Agreement. When EBI and Orthofix representatives met in June 1994 to negotiate a renewal, the relationship collapsed due to a dispute over the division of sales revenues. In anticipation of the termination of the Agreement, each party took steps in an effort to protect its own long-term business interests. Orthofix sought and located a new distributor, and on May 8, 1995, it announced that it had acquired American Medical Electronics, which became Orthofix, Inc. Upon the expiration of the Agreement with EBI in June 1995, Orthofix, Inc. became the exclusive United States distributor of the Orthofix fixator.

For its part, EBI responded to the impending severance of its relationship with Orthofix by beginning development of its own external fixator, "Dynafix," with sales of that fixator to begin after expiration of the Distribution Agreement. It is EBI's conduct in anticipation of and after termination that led to this litigation.

B.

LITIGATION

1. Complaint, Answer, Counterclaim

In November 1995, Inter Medical Supplies sued EBI in the United States District Court for the District of New Jersey for failure to pay for several shipments of products sold during that year. At approximately the same time, Orthofix, Inc. and Orthofix S.r.l. also filed suit against EBI in the United States District Court for the Northern District of Texas, alleging breach of contract of the 1990 Distributor Agreement; misappropriation of trade secrets; patent

5

infringement, 35 U.S.C. S 271; violations of the Lanham Act, 15 U.S.C. SS 1114, 1125(a); unfair competition under Texas law, Tex. Bus. & Com. Code Ann. S 16.29; fraud under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. S 56:8-2; common law unfair competition; intentional interference with prospective contractual relations; defamation and trade libel; and injurious falsehood and product disparagement.

On EBI's motion, the Texas case was transferred to the New Jersey District Court. EBI then answered and counterclaimed for breach of contract, tortious interference with both the 1990 Distributor Agreement and EBI's other customer and business relationships, fraud, defamation, violation of the Lanham Act, breach of the distribution franchise on New Jersey statutory and common law grounds, and other breaches and torts arising from the parties' contractual relationship.

The parties proceeded with discovery and pretrial. In one significant in limine ruling on a key clause in paragraph 6(d) of the Distributor Agreement, the District Court ruled that the language of the clause prohibited EBI from developing during the term of the agreement any product competitive to those it was distributing for Orthofix. See Orthofix, Inc. v. EBI Med. Sys. Inc., Civ. Action No. 95-6035 (SMO), at 14 (D.N.J. Apr. 8, 1997) (hereafter In Limine Ruling).

2. Trial

The jury trial began on April 7, 1997, and lasted two months. At its conclusion, the jury responded to special verdict questions by finding in favor of Orthofix on its claims for breach of contract, breach of the duty of good faith and fair dealing, tortious interference with prospective economic advantage, tortious interference with contract, defamation, unfair competition, and violation of the Lanham Act. EBI does not contend on appeal that the evidence was insufficient for the jury to find it liable for breach of contract. In fact, the District Court found, and we agree, that the jury could have concluded that EBI's plan involved the development and production of its own external bone fixator to compete directly with Orthofix

6

following the end of the distributorship. Inter Med. Supplies, 975 F.Supp. at 685. Other evidence supported the conclusion that EBI's strategy was to convert present Orthofix purchasers to the new EBI fixator and to drive Orthofix from the North American market. EBI started the process of bringing its own fixators to market in July 1994, although it did not formally place its product on the market until August 1995.

In addition to developing its new, competitive product, EBI ordered vast quantities of the Orthofix products and parts it was then distributing. From October 1994 to May 1995, EBI began ordering Orthofix product in amounts far in excess of its two-month inventory needs. It eventually stockpiled inventory sufficient to meet its needs for sixteen months. There was evidence that to achieve this result, EBI hid its stockpiling of Orthofix products by ordering and paying for products through third parties. For nearly one year EBI also failed to provide Orthofix with a series of required quarterly reports of its sales and inventory levels, further preventing Orthofix from promptly learning of EBI's excessive ordering.

Once the final Distributor Agreement terminated at the end of May 1995, EBI began to take advantage of the market it had earlier created for Orthofix products. There was evidence that in order to continue to have such Orthofix products available to it, EBI acquired Orthofix product components through third parties. Its employees used reverse engineering to analyze the construction of these Orthofix components and then substituted EBI-manufactured parts for genuine Orthofix ones. EBI never informed medical professionals of the substitution, in effect passing off EBI's own components for those of Orthofix.

When the new EBI bone fixators ultimately appeared on the market, EBI promoted them through practices the jury could have found deceptive. The sales force inaccurately described the fixators to purchasers as upgrades to or newer versions of the Orthofix products that EBI had been selling for years. At the suggestion of EBI's president, James Pastena, salespersons falsely stated that EBI elected to terminate the distributorship because the Orthofix

7

product line was inadequate for the needs of the medical profession.

On the basis of this and like evidence, the jury found that EBI had both breached its contract with Orthofix and committed various torts. The jury awarded the Orthofix companies $48 million in compensatory damages. The verdict sheet, however, did not specify what portion, if any, of the $48 million compensatory damages award was meant to compensate the tort injuries and what portion, if any, was meant to remedy the contractual breaches. The jury also awarded $100,600,000 in punitive damages, which contained no breakdown by defendant or count. In a separate determination, the jury awarded Inter Medical Supplies $875,399 to compensate for EBI's failure to pay for products delivered at EBI's request.

In response to EBI's counterclaims, the jury concluded that Orthofix had engaged in tortious conduct and breached the Distributor Agreement. It awarded one dollar in damages on the contract breaches and tortious acts, as well as granted a one-dollar set-off for Inter Medical Supplies' breaches in filling and shipping EBI's orders.

3. Post-Trial Motions

After the verdict, EBI moved for judgment as a matter of law or for a new trial pursuant to Federal Rule of Civil Procedure 50. It also requested that the District Court grant a remittitur on the punitive damages assessment. EBI broadly attacked the trial and verdict, asserting that there was insufficient evidence to support a finding of liability under either a tort or a breach of contract theory, or to support the damages calculation. EBI claimed that the court failed to assure that the jury distinguished between tort and breach of contract damages. Finally, EBI alleged that the court failed to adequately respond to references Orthofix made in its closing to EBI's alleged violations of the Food, Drug, and Cosmetic Act ("FDCA").

The District Court rejected EBI's legal arguments on all issues except the punitive damages remittitur. See Inter Med. Supplies, 975 F. Supp. at 702-03. Deferring in great part to the jury, the court concluded that the evidence was sufficient to support both the jury's findings of tortious

8

conduct and breach of contract and its calculation of compensatory damages. See id. at 686–88. In response to EBI's claim that Orthofix's allegations of FDCA violations prejudiced the jury, the court noted that it had submitted to the jury EBI's own proposed instruction for curing that error. See id. at 690–91.

EBI also argued that because the jury failed to apportion the compensatory damages between the tort and breach of contract claims, instead awarding all such damages in a single sum, the punitive damages award could not be sustained because it could be applied only for tortious conduct, which had not been separately assessed. The District Court rejected that argument, observing it had instructed the jury on that issue and that the jury presumably understood the instructions. Although the New Jersey Punitive Damages Act, N.J. Stat. Ann. SS 2A:15–5.9 to .17, provides that punitive damages must be apportioned among defendants, EBI had not objected to the jury's failure to allocate, and the District Court found a waiver. See id. at 696–98. The court concluded that the jury could have found that EBI's tortious conduct was malicious and "accompanied by a willful disregard of the plaintiffs' rights," id. at 694, warranting punitive damages. Additionally, the court noted that the amount of punitive damages awarded fell within the range permitted by the Constitution and the New Jersey Act.

However, the District Court exercised its authority to review the award for reasonableness under New Jersey law and reduced the amount of punitive damages to $50 million under the New Jersey Act. See Inter Med. Supplies, 975 F. Supp. at 698–702. The court concluded that the jury could not have found that the conduct between these private parties was likely to recur, see id. at 700; that cases involving purely economic harm and the enforcement of private rights, such as this one, warrant different treatment than do suits involving a "serious threat to public health," such as products liability suits, in which a defendant has placed a defective product into commerce and into the hands of unsuspecting consumers, id. at 700–01; and that the amount the jury awarded was unreasonable given the other factors in the case, see id. at 701–02.

9

The District Court issued its opinion and order on August 28, 1997, and an amended judgment on September 2, 1997. On September 26, 1997, EBI filed a notice of appeal with the United States Court of Appeals for the Federal Circuit, presumably because, at one point, Orthofix's complaint included a patent infringement count. On Orthofix's motion, the Federal Circuit transferred the appeal to this court pursuant to 28 U.S.C. S 1631, because Orthofix had abandoned the patent claim early in the litigation. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

II.

DISCUSSION

EBI raises five claims on this appeal. Three of them are directed to the District Court's interpretation of the language of the Agreement and the effect of EBI's conduct; the latter two are directed to the damages awards. As to the Agreement, EBI claims that the District Court erred when it interpreted EBI's promise under paragraph 6(d) of the Distributor Agreement not to "in any way handle" competing products as prohibiting EBI from developing a competing bone fixator product while the agreement was in existence. EBI next asserts that the District Court erred in interpreting the Agreement as including duties of good faith and fair dealing as they pertain to EBI's orders for fixator products. It also contends that the District Court erred in concluding that EBI's over-ordering of products constituted tortious interference with Orthofix's prospective economic advantage. As to damages, EBI argues that the jury's award of $48 million was speculative and lacked substantial evidence. Finally, EBI vigorously argues that the punitive damages award, even as reduced, was the product of prejudice, violated New Jersey law, and was excessive and unreasonable. We review these contentions seriatim.

10

A.

INTERPRETATION OF PARAGRAPH 6(d)

In paragraph 6(d) EBI undertook "not to distribute, sell, promote the sale of, or in any way handle . . . any product which could reasonably be deemed competitive" with Orthofix's products. Before trial, EBI moved for an in limine ruling to preclude Orthofix's introduction of extrinsic evidence on the meaning of this paragraph. After a hearing and thorough consideration of the parties' arguments and submissions, the District Court denied the motion, holding that the handling clause unambiguously prohibited development of a competitive product during the term of the Agreement. We must consider at the outset whether EBI preserved this issue for appeal.

Orthofix argues that EBI waived any objections that it might have had to either the District Court's in limine ruling or the court's subsequent jury instruction because EBI did not object to the District Court's construction of the "handle" clause at any time after resolution of the motion in limine. The issue was not raised during the course of formulating or giving jury instructions. And, EBI's own proposed instruction largely incorporated the construction to which it now objects, stating:

> [T]he phrase "in any way handle" in Paragraph 6(d) of the Distributor Agreement includes "a prohibition on the development of a competitive product in the marketplace."

App. at 1477. Indeed, this was substantially the instruction given by the District Court without objection from EBI. Our recent precedents provide some guidance on this issue.

In American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321 (3d Cir. 1985), we considered whether a formal exception to the admission of evidence would be necessary to preserve that issue for appeal, if the court had already issued a definitive in limine ruling. There, the insurer, American Home, sought an in limine ruling to prevent the admission of evidence that it never prosecuted the arson on which it based its refusal to

11

pay the policyholder. The court refused to give the ruling that American Home requested, reasoning that the evidence was admissible. See id. at 324. After it lost at trial, American Home appealed, citing as error the admission of such evidence. The insured asserted that American Home had waived the claim when it failed to raise an objection at trial. We rejected that argument, explaining that the reason we require parties to raise objections or waive them is to assure that the court's attention is drawn to potential errors before it is too late to remedy them. See , e.g., Smith v. Borough of Wilkinsburg, 147 F.3d 272, 276 (3d Cir. 1998). We further held that this rationale is no longer applicable once a court has not only learned of the alleged error, but issued a definitive ruling that it is unlikely to reconsider in the future. American Home Assurance, 753 F.2d at 324. We concluded that "requiring an objection when the evidence was introduced at trial would have been in the nature of a formal exception and, thus, unnecessary under [Federal Rule of Civil Procedure] 46." Id. at 325.

In our recent decision in Walden v. Georgia-Pacific Corp., 126 F.3d 506 (3d Cir. 1997), we relied on American Home Assurance, articulating the applicable principle as providing that a party can preserve an evidentiary issue for appeal by, first, providing the court with a written motion including reasons and case authority, and second, obtaining a definitive ruling that does not suggest the matter will be reconsidered later at trial. Id. at 518. But see Simmons v. City of Philadelphia, 947 F.2d 1042, 1082-83 (3d Cir. 1991) (Becker, J., announcing judgment of court) (discussing concerns raised where party's continued adherence to objection is unclear).

The reasoning of American Home Assurance and Walden is persuasive here. Once EBI obtained a definitive ruling after full briefing on the disputed contract provision, there was little purpose in repeatedly raising the issue at trial because there was little likelihood that the court would revisit its decision. Nevertheless, Orthofix argues that we must review the jury instruction only for plain error because the District Court adopted, with only slight revision, the charge that EBI itself proffered. It may be that the same reasoning that supported our conclusion in

12

American Home Assurance and Walden that no objection was required when the evidence at issue was proffered also supports holding that EBI did not waive its objection by submission of its proposed charge.

One could reasonably argue that the purpose underlying Federal Rule of Civil Procedure 51, which governs objections to jury instructions, would not be advanced by requiring a party to submit an instruction that contradicts a definitive in limine ruling or to object to a proposed instruction that incorporates that ruling. Cf. Smith, 147 F.3d at 277. Under that theory, the initial definitive ruling decides the question for the case and satisfies the requirement of Rule 51 that the record contain "the matter objected to and the grounds of the objection." A litigant's attempt to revisit that ruling at the time of the jury instructions would use the court's time and resources inefficiently.

We need not decide that issue here. Although in many cases the difference between plenary review and plain error review would be dispositive, in this case it is not, as the conclusion we reach using plenary review, which ordinarily applies when we review the District Court's interpretation of the contract, see Williams v. Metzler, 132 F.3d 937, 946 (3d Cir. 1997), would necessarily be the same were we to apply the more restrictive plain error review.

We now turn to consider EBI's objection to the District Court's in limine ruling. The gist of the dispute between the parties is whether to define the word "handle" broadly or narrowly, particularly in light of the prefatory phrase "in any way." Both parties contended in connection with the in limine ruling that the "in any way handle" clause was unambiguous, although they disagreed on its meaning. Here, EBI renews its argument that the clause is unambiguous. It then proceeds, relying on United States principles of contract interpretation, such as ejusdem generis, to argue that the language should be interpreted narrowly. Under the interpretation EBI proffers, the clause precluded it from distributing, selling, or marketing competing products, but not from developing such products.

13

It finds support for this definition from Webster's Third New International Dictionary 1027 (1961) (defining "handle" as, inter alia, "to trade in: engage in the buying, selling, or distributing of ") and from Random House Dictionary of the English Language 866 (2d ed. 1987) (defining"handle" as, inter alia, "to deal or trade in").

Orthofix responds that the meaning of the "handle" clause is broad enough to include more than selling, distributing, and promoting, which activities already are listed in the contract, and that it also encompasses prohibition of any development by EBI of competing products. It notes that the dictionary also includes the following listings for handle: "2(b): to conduct oneself in relation to, assume an attitude"; "2(c)(1): manage, control, direct"; and "2(e): deal with, act upon, dispose of, perform some function with regard to." Webster's Third New International Dictionary 1027; see also Random House Dictionary of the English Language 866 (listing"11. to manage, deal with, or be responsible for" and"13. to manage, direct, train, or control"). Additionally, Orthofix denies that ejusdem generis has any application in this context.

We observe that paragraph 15 of the Distributor Agreement provides: "This agreement shall be governed by the laws of the Republic of Italy." The parties introduced affidavits from experts in Italian law at the in limine hearing. According to the District court these experts effectively agreed that "because the Distributor Agreement was drafted in English, the terms of that agreement should be given their natural meaning in English." In Limine Ruling at 8.

The District Court relied heavily on the dictionary definition of "handle," from which it construed the word to prohibit development of a product during the lifetime of the agreement. It explained that it construed the word expansively because of the prefatory words "in any way." See In Limine Ruling at 9. Additionally, the District Court was "not convinced that ejusdem generis is a canon of construction known to Italian law." In Limine Ruling at 10. Neither party has directed our attention to case law that

14

supports its expert's position, and apparently neither party provided the District Court with any such authority.

Thus, there is no support for the contention that Italian law would permit courts of the United States to apply United States interpretive rules to a contract invoking Italian law. Even if it were appropriate to use such rules, we agree with the District Court that they could not be applied to restrict the meaning of the term "handle" because that term is immediately preceded by the phrase "in any way." Therefore, we conclude that the District Court did not err when it approached the question as one of plain meaning and relied on the ordinary dictionary definition of the words "in any way handle."

We agree with the District Court that the inclusion of the phrase "in any way" suggests a broad interpretation of the term "handle" and supports the reading that Orthofix urges us to adopt. We thus conclude that the Agreement prohibited EBI from researching and developing a competing product during the tenure of that contract.

As an alternative, EBI argues that if the clause is ambiguous, the District Court should have left the issue for the jury rather than relying on extrinsic evidence. But even if we were to engage in an inquiry whether the contract's language is ambiguous, we are satisfied that the District Court did not err in its analysis under that approach. "[A] contract is unambiguous if it is reasonably capable of only one construction." Tamarind Resort Assocs. v. Government of the Virgin Islands, 138 F.3d 107, 110-11 (3d Cir. 1998). Our case law sets forth the steps to be taken in establishing whether or not contract language is ambiguous. "To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. . . . Before making afinding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993).

Review of the District Court's disposition of EBI's motion in limine establishes that the court followed the required

15

steps in identifying ambiguity. The court considered the handling clause language, the dictionary definition of the phrase "to handle," and the context of the phrase. It analyzed and discussed the alternative meanings assigned to the phrase by counsel and explained that, in context, only one of these interpretations was reasonable. Finally, the court found that its construction of the handling clause was supported by extrinsic evidence regarding what Orthofix intended in insisting that the handling clause remain in the agreement.

EBI argues that the District Court exceeded its authority in considering extrinsic evidence in support of Orthofix's interpretation of the contract. That extrinsic evidence included an internal memorandum dated June 6, 1990, from Robert Gaines-Cooper, group chairman of Orthofix, to Orthofix counsel Daniel Gilioli, which memorialized certain aspects of the negotiation of the Distributor Agreement then underway between Orthofix and EBI. In the memorandum, Gaines-Cooper wrote that he had rejected EBI's request to remove the phrase "in any way handle" from the Distributor Agreement so that EBI could develop a competing product during the final year of the Agreement. The court also considered a draft of the Distributor Agreement obtained from EBI files in which the words "in any way handle" were crossed out.

Finally, the District Court held a hearing pursuant to Federal Rule of Evidence 104 at which Gaines-Cooper testified that it was his understanding that EBI wanted to develop a competing product and that he refused to remove the phrase "in any way handle" from the Distributor Agreement in order to prevent such development. Thereafter, the District Court engaged counsel in a lengthy discussion about the reliability of Orthofix's evidence, and concluded that there was "no extrinsic evidence to contradict the testimony of Mr. Gaines-Cooper or to impeach . . . the memorandum to [his counsel]." In Limine Ruling at 14. In arguing that this reliance on extrinsic evidence was misplaced, EBI ignores our precedent."Before making a finding concerning the existence or absence of ambiguity, we consider . . . the extrinsic evidence offered in support of each interpretation." Teamsters Indus.

16

Employees Welfare Fund, 989 F.2d at 135. As we stated there, "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." Id.

We conclude that the District Court did not err in relying on extrinsic evidence and that, in light of all of the relevant factors cited by the District Court, the handling clause is "reasonably capable of only one construction." Tamarind Resort Assocs., 138 F.3d at 110-11. Thus, the District Court did not err in holding that the contract was not ambiguous and in concluding that the Agreement's "in any way handle" clause prohibited EBI from developing a competing bone fixator product during the term of the agreement. Therefore, it did not err in so instructing the jury.

B.

IMPLIED CONTRACTUAL DUTY NOT TO OVER-ORDER

EBI next takes issue with the decision that it breached the contract by over-ordering Orthofix products. It argues that the District Court erred in concluding that the contract contained an implied duty of good faith and fair dealing not to over-order. EBI further contends that there is insufficient evidence of the damages, if any, the alleged over-ordering caused and concludes that the entire compensatory award must therefore be overturned.[1]

The parties agree that there is no express provision in the Agreement that prohibits EBI from ordering as much as it

_____

1. Orthofix argues that EBI's motion for judgment as a matter of law was limited to the claim that Orthofix could not recover damages for alleged excess orders, assuming that those orders did breach EBI's implied duty of good faith, and, consequently, that EBI cannot now appeal on the claim that there was no implied duty. We reject Orthofix's claim, because EBI argued in its motion that it was entitled to order and sell as much Orthofix product as it wanted under the contract, see App. at 1386, 1440, an argument that assumes the absence of an implied duty of good faith.

17

could purchase. EBI notes that paragraph 8 of the Agreement obligated Orthofix to "promptly supply. . . such quantities . . . as are ordered from time to time," without limiting that obligation in any way, see App. at 207, and that paragraph 6(k) required EBI to maintain an inventory level covering at least two months requirements, see App. at 206. Thus, EBI concludes, the contract specifically addresses what amount it could order, setting a minimum but no maximum. It then points out that under our decision in USX Corp. v. Prime Leasing Inc., 988 F.2d 433 (3d Cir. 1993), "[t]here can be no implied covenant as to any matter specifically covered by the written contract between the parties." Id. at 439 (citation omitted).

We need not decide whether EBI's argument would be persuasive under other circumstances because it is based on principles of United States contract law, whereas, as discussed above, the Agreement, by its terms, must be construed in accordance with Italian law. Therefore, we must attempt to ascertain whether Italian law would infer a duty of good faith and, if so, whether such a duty would include the obligation not to over-order.

We engage in plenary review of a question of foreign law. See Grupo Protexa, S.A. v. All American Marine Slip, 20 F.3d 1224, 1239 (3d Cir. 1994). "[E]xpert testimony is the most common way to determine foreign law. . . ." In the Matter of the Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Import & Export Corp., 978 F. Supp. 266, 275 (S.D. Tex. 1997), aff'd and op. adopted in relevant part, Trans Chem. Ltd. v. China National Mach. Import & Export Corp., 161 F.3d 314, 319 (5th Cir. 1998) (per curiam).

Here, each party relied on the affidavits of its own expert. These experts reviewed the Agreement to determine whether it included an implied duty of good faith. They agreed that, under Italian law, it did. They disagreed, however, as to the content of the implied duty in this context, and hence as to the permissible level of EBI orders under Italian law.

Orthofix's expert, Professor Piero Bernardini, working from the assumption that EBI purchased fixators "in excess of its actual requirements for the purpose of resale after the expiration of the Agreement," App. at 1334, described such

18

conduct as "manifestly in breach of the good faith duty in the contractual performance." App. at 1343. He concluded that although there was no language referring to a duty not to order excessively, the Agreement did link orders to EBI's "expected requirements." See App. at 1343. He found that linkage in paragraph 3 of the Agreement, which provides:

> Firm orders for the products shall be placed with Orthofix within the first fifteen (15) days of a given month for shipment at least two (2) months from the date of the order. With each of said orders EBI shall provide Orthofix with a written forecast of its expected requirements of the product for the three (3) subsequent months commencing from the end of the two (2) months period for which the said shipments are intended. Such forecasts shall not be binding on either party.

App. at 203.

In contrast, EBI's expert, Professor Fabio Emilio Ziccardi, interpreted the Agreement as a requirements contract under Italian civil law, and stated that, because the contract specified a minimum but no maximum amount of product, EBI was free to order any amount above the minimum, subject only to Orthofix's acceptance of that order. App. at 240-42.

In the face of disagreement between experts on such matters, we may adopt any position that is supported by reasonable inferences either from the respective country's law or "from the implications of a legal concept such as a contract or testament or juristic personality." Merinos Viesca y Compania, Inc. v. Pan American Petroleum & Trans. Co., 83 F.2d 240, 242 (2d Cir. 1936); cf. Mobile Marine Sales, Ltd. v. M/V Prodromos, 776 F.2d 85, 89-90 (3d Cir. 1985) (rejecting Panamanian official's certification of due registration in favor of court's own reading of Panamanian law); In the Matter of Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Import & Export Corp., 978 F. Supp. at 275 ("[F]ederal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." (citation omitted)).

19

We conclude that Orthofix's expert's interpretation of the Agreement is more reasonable because it relied on the language in the Agreement, particularly that in paragraph 3 obliging EBI to provide Orthofix with a forecast of its expected requirements for the three months after the two-month order period. EBI's expert, on the other hand, relied more heavily on the absence of language. The contractual obligation that EBI provide Orthofix with a forecast of its need for the three months after its current inventory was likely to be exhausted, although not binding on either party, certainly suggested both that Orthofix expected EBI to keep its inventory fairly current and that there was a relationship between EBI's immediate inventory needs and its orders. There would be no need for such a provision if the parties intended to allow EBI to accumulate, without notice, inventory for sixteen months. Bernardini's interpretation also more effectively integrates paragraph 3, on which he relied, with three other paragraphs: paragraph 6(e) (requiring EBI to forward to Orthofix, inter alia, monthly sales reports and "quarterly reports indicating the quantity of Products comprising EBI's inventory"), App. at 205; paragraph 6(k) (requiring EBI to maintain inventory "reasonably necessary to meet its resale requirements for at least two (2) months"), App. at 206; and paragraph 11.1 (requiring Orthofix to fill any order it accepted before the expiration of the Agreement), App. at 207.

In light of these provisions, we are persuaded that Italian law would not give EBI free reign to order whatever it wanted so long as Orthofix accepted the orders and made some attempt to fill them. Thus, the District Court did not err when it accepted the position of Orthofix's Italian law expert that EBI had an implied duty of good faith and fair dealing not to over-order Orthofix products.

Moreover, even if this were a question of United States contract law, subject to plenary review, see Williams, 132 F.3d at 946, we would find against EBI. As noted above, EBI's argument is that there can be no implied duty not to over-order because the contract specifically covers the issue. The principal provision to which it refers is paragraph 8, which covers Orthofix's obligation to fill EBI's orders. Even EBI's own Italian expert rejected that

construction, opining that the Distribution Agreement only specifies a minimum, App. at 241, and "clearly has no provision at all concerning the purchases `in excess,' " Supp. Affidavit S 4.4. In the absence of any provision that "specifically covers" the matter, we reject EBI's contention that United States contract law bars the covenant implied here by the Agreement.

There was evidence to support the jury's finding that EBI over-ordered and stockpiled Orthofix products while actively misleading Orthofix about its need for additional product, thereby breaching the duty of good faith and fair dealing. Examining this evidence in the light most favorable to Orthofix, we conclude that the District Court properly denied EBI's motion for judgment as a matter of law.

EBI nonetheless contends that Orthofix failed to present evidence of the damages it claims to have suffered from EBI's sale of the excess products, and argues that therefore the entire damages award should be reversed. As we have previously observed, even when an entire theory of liability relied on at trial is subsequently held impermissible, the jury's finding of liability on a separate theory in a special verdict can sustain the award of damages. See Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 806 (3d Cir. 1984); see also Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 100 (3d Cir. 1993). It follows that even if Orthofix failed to identify the damages caused by the sale of the over-ordered product, that would not negate the jury's liability verdicts on the three other contract breaches and the eight torts. Moreover, the case was not presented as a series of separate breaches of contract and tort, each of which caused separate defined damages. Thus, there is no basis to overturn the entire compensatory damages award.

C.

TORTIOUS INTERFERENCE

In a related claim, EBI contends that the District Court erred in denying its motion for judgment as a matter of law on the jury's verdict that held it liable for the tort of

21

interference with prospective economic advantage on the basis of its conduct in over-ordering bone fixators. EBI argues that the evidence did not establish that it lacked justification or excuse for its conduct, one of the required elements for the tort,[2] and that "[b]reach of contract, without more, is not a tort." Appellants' Br. at 33 (quoting Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 664 (3d Cir. 1993)).[3]

EBI mischaracterizes Orthofix's position. Orthofix never argued that EBI's breach of the Agreement constituted a tort. Rather, it contended at trial that EBI improperly sold the fixators and, thereby, interfered with Orthofix's economic relationships.

In denying EBI's post-trial motion for judgment as a matter of law on this issue, the District Court concluded that there was evidence that EBI used fraudulent and unlawful means to obtain the fixators and, just as important, that EBI then sold the fixators in direct competition with Orthofix. The court held that, from this evidence, the jury could have concluded that EBI engaged in tortious interference by over-ordering, regardless of whether the act of over-ordering breached the contract. Inter Med. Supplies, 975 F. Supp. at 687.

We agree. Although Orthofix does suggest that some of EBI's conduct in obtaining the excessive quantities of fixators contributes to its tortious interference claim, it also emphasizes that EBI tortiously interfered by selling those

_____

2. This tort requires proof of five elements: (1) plaintiff 's expectation of
economic benefit; (2) defendant's knowledge of that expectation; (3) defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability of benefit to the plaintiff in the absence of that
wrongful interference; and (5) damages. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993). EBI's appeal contends that there was a failure of proof on element (3).

3. Orthofix again contends that EBI waived its appeal for this position, because EBI moved exclusively on the grounds of sufficiency of the evidence, not whether the conduct would amount to tortious interference. However, EBI did raise the claim that the conduct amounted only to breach of contract and not tortious interference in its Rule 50(b) motion. Thus, we reject Orthofix's argument.

22

products to the very customers that otherwise would have been purchasing from Orthofix.

Moreover, the jury was entitled to conclude that EBI's proffered justification for its conduct did not completely explain its actions. EBI argued that the actions it took were defensive, designed to protect itself against the coming loss in business expected to result from the termination of its Orthofix distributorship. However, Orthofix introduced evidence that EBI's president described his company's post-Agreement relationship with Orthofix as a "war," and his objective as being to "destroy Orthofix." App. at 507. With this evidence, the jury was entitled to conclude that EBI's explanation for acquiring and selling the fixators was inadequate to explain its decision to compete in the market when and how it did, and that its conduct was tortious interference with Orthofix's prospective economic advantage.

We conclude that the District Court did not err in denying EBI's motion for judgment as a matter of law on this ground.

D.

COMPENSATORY DAMAGES

EBI next challenges the $48 million compensatory damages award, and asserts that the District Court erred in permitting Orthofix to recover any compensatory damages because the amount of such damages was speculative. In doing so, EBI expands on its argument that the District Court erred in denying the motion for judgment as a matter of law on the breach of contract and tortious interference counts because Orthofix failed to establish specific damages associated with each cause of action. Relying on our statement in Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1353 (3d Cir. 1975) --"we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition"-- EBI contends that the jury's award here was impermissible speculation.

23

Although the award appears large, we review it keeping in mind the following observation by the District Court, which was intimately familiar with the case and the evidence:

> In an effort to maintain their commanding position as the leading United States marketer of external bone fixators until such time as their own products could be successfully launched, defendants attempted to secure a large inventory of Orthofix products. That plan was largely successful, and Orthofix is no longer a major force in the United States market for external bone fixation devices.

Inter Med. Supplies, 975 F. Supp. at 685. EBI's actions thus secured for it the market that had previously been Orthofix's, an injury from which Orthofix has not recovered.

EBI makes essentially three arguments against the award of compensatory damages: First, that Orthofix's consultant created flawed market projections, and that Creighton Hoffman, the Orthofix expert who ultimately testified, prepared damage estimates in reliance on these projections; second, that Hoffman's testimony departed from the consultant's analysis with respect to the recapture of profit and relied instead on inflated market share projections made by Orthofix's executives; and third, that Hoffman improperly inflated his damage estimates by taking sales growth data prepared by EBI's own damage experts out of context and applying it to a situation that did not reflect actual market conditions.

These arguments echo those EBI presented to the District Court in a motion in limine and in motions for judgment as a matter of law. The court rejected EBI's arguments, focusing first on Hoffman's testimony and then emphasizing that "while [the analysis] certainly yielded a large number, [it] was not flawed as a matter of law. The jury could have rejected that testimony in its entirety. It did not." Id. at 691. The court further observed that EBI's economic expert also testified and that the jury presumably took the time and effort to consider carefully the damages evidence each side presented. Id.

The disputed calculation proposed lost profits not exceeding $95 million and actual damages not in excess of

that number. The District Court rejected EBI's complaint that the damages were "undifferentiated," noting that "[p]laintiffs tried this case on numerous alternative theories of liability each of which would support an award of`lost profits.' To the extent the plaintiffs prevailed on any theory which was supported by sufficient evidence, they are entitled to the full measure of compensatory damages, and no more." Id. Referring to Orthofix's expert's testimony, the District Court rejected EBI's complaint that Orthofix failed to present testimony separating the damages by entity and by claim. The court suggested that such specificity would have created jury confusion, as well as a strong potential for duplicative or excessive damages. Id. The court explained:

> Because all of the claims upon which plaintiffs prevailed arose from the same set of facts surrounding the defendants' plan to convert the Orthofix external fixator market to the purchase of Dynafix, and because that plan succeeded, plaintiffs' lost profits need not be assigned to a given legal theory. Damages ordinarily flow from conduct, not from legal theories.

Id.

We review the District Court's denial of post-trial motions regarding that compensatory damages verdict for abuse of discretion. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 437 (1996); American Nat'l Bank & Trust Co. v. Regional Transp. Auth., 125 F.3d 420, 437 (7th Cir. 1997).

Although New Jersey law requires a "reasonably accurate and fair basis for the computation of alleged lost profits," J.L. Davis & Assocs. v. Heidler, 263 N.J. Super. 264, 276, 622 A.2d 923, 929 (Sup. Ct. App. Div. 1993) (citation omitted), the fact that a plaintiff may not be able to fix its damages with precision will not preclude recovery of damages. See American Sanitary Sales Co. v. New Jersey, 178 N.J. Super. 429, 435, 429 A.2d 403, 406 (Sup. Ct. App. Div. 1981). EBI's arguments addressing the reliability and source of Hoffman's data presumably were made with equal force to the jury. Hoffman was cross-examined at length, and EBI presented its own damages expert who painted a more conservative view of Orthofix's economic

prospects. The District Court properly held that the credibility of the experts was for the jury to determine, and we see no reason for concluding that there was an abuse of discretion.

E.

PUNITIVE DAMAGES

The most troublesome issue on appeal is that presented by the jury's award of punitive damages in the amount of $100,600,000 remitted by the District Court to $50,000,000.

EBI argues at the outset that we must reverse the punitive damages award because the jury's verdict, which does not distinguish between tort and breach of contract damages, leaves us no basis to apply the New Jersey Act, which limits a plaintiff 's punitive damages to either $350,000, or five times the compensatory damages, whichever is greater. N.J. Stat. Ann. S 2A:15-5.14. It reasons that because punitive damages are not available for breach of contract, this court cannot determine whether the strictures of the New Jersey Act are met without determining what portion of the $48 million compensates for tort violations in this case.

Orthofix responds that EBI waived this argument by failing to object to the jury instructions and the verdict sheet when they were presented. We agree. EBI's trial counsel did not object on the ground now pressed, either when the instructions and verdict sheet were given to the jury or when the jury returned.4 We believe, in line with other circuits, that EBI's failure to object at the time the jury received the proposed verdict sheet when the jury returned constitutes a waiver of this objection. See Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc., 934

_____

4. The District Court did address EBI's argument that the verdict sheet failed to distinguish among the various defendants, but found that the verdict was consistent with the defendants' own requested charge, which did not require the jury to list each award separately. Inter Med. Supplies, 975 F.2d at 697. EBI has not raised this issue on appeal.

26

F.2d 1217, 1226 (11th Cir. 1991) (party waived objection to any inconsistency in jury response to special interrogatories by failing to raise issue before jury was excused); White v. Celotex Corp., 878 F.2d 144, 146 (4th Cir. 1989) (same) Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529 (5th Cir. 1974) (same). Even if this argument were not waived, the breaches of contract here were so intertwined with the tortious scheme to steal Orthofix's market that the full award is properly attributable to the tortious conduct.

We turn then to EBI's challenge to the punitive damages award. EBI claims that the award, even as remitted by the District Court, is inconsistent with both the New Jersey Punitive Damages Act, N.J. Stat. Ann. S 2A:15-5.9 et seq., and the Due Process Clause of the Fourteenth Amendment.5 It argues that the jury awarded punitive damages from passion and prejudice, that Orthofix failed to produce evidence of some defendants' financial condition as required by the New Jersey Act, and that even the $50 million punitive damages award is excessive.

The standard of review that we apply depends upon the particular challenge asserted. To the extent that EBI complains about the admission of certain evidence, we review the District Court's ruling under an abuse of discretion standard. See Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 270-71 (5th Cir. 1994). To the extent that the issues EBI raises have a legal component, our review is plenary. See Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1334 (11th Cir. 1999). The Supreme

_____

5. There are no reported New Jersey Supreme Court opinions that the parties have cited or we have found which interpret the Act. See Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.15 (3d Cir. 1996) ("When a federal court exercises diversity jurisdiction, it must apply the substantive law as decided by the highest court of the state whose law governs the action."). The Act requires a trial court judge to "ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter the defendant from repeating such conduct." N.J. Stat. Ann. 2A:15-5.14(a). The parties have not argued that this act expands protection against excessive punitive damages awards beyond the minimum guarantees of the Due Process Clause of the Fourteenth Amendment.

Court has stated that state law governs the propriety of awarding punitive damages and the factors to be considered in determining the amount, but that federal law controls "those issues involving the proper review of the jury award by a federal district court." Browning-Ferris Indus., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989).

1. Passion and Prejudice

If it can be shown that a jury verdict resulted from passion or prejudice, a new trial is the proper remedy. See Dunn v. Hovic, 1 F.3d 1362,1383 (3d Cir. 1993) (en banc). EBI argues that the sheer size of the award here demonstrates that the jury's decision was a product of passion and prejudice. However, in Dunn we declined to find that there is "some level of award that would in itself evidence prejudice and passion," and held that even if there were such a level, the award in Dunn, $25,000,000, would not have reached it. Id.

EBI also argues that several statements made by Orthofix concerning EBI's counsel and EBI's alleged violations of the FDCA inflamed the jury and contributed to the prejudice, warranting reversal. The District Court rejected this argument, noting that EBI requested and received its own curative instruction. Inter Med. Supplies, 975 F. Supp. at 690 ("[T]o the extent there may have been any prejudice, defendants sought and obtained a curative jury instruction, [and] the present assertion of prejudice is without merit.") Indeed, EBI represented to the District Court that the instruction given "perfectly addresse[d] the concern with FDA." Id. (citation omitted).

We have reviewed the closing argument, the objections raised in the District Court, and the curative instruction. We do not find sufficient support for EBI's allegation of a connection between counsel's remarks in closing and the size of the verdict to warrant granting a new trial. This is especially true where EBI received the curative instruction it requested and did not object to any improper references to counsel during the closing argument. We conclude, therefore, that the District Court did not err in rejecting EBI's arguments that the verdict was the product of passion or prejudice.

28

## 2. Evidence of Defendants' Financial Condition

EBI also challenges the award on the ground that Orthofix failed to provide evidence of some defendants' net worth. Under the New Jersey Act, a trier of fact assessing the award of punitive damages "shall consider . .. [t]he financial condition of the defendant," N.J. Stat. Ann. 2A:15-5.12(c), in order to formulate an award which is "specific as to [each] defendant," N.J. Stat. Ann. 2A:15-5.13. EBI argues that Orthofix failed to establish an essential element of punitive damages under New Jersey law by not producing evidence concerning the financial condition of two of the corporate defendants, Electro-Biology and EBI Medical Systems.

There is some question whether this issue has been waived because it was not raised before the District Court. In any event, the record establishes that Orthofix did introduce evidence of both EBI Medical Systems' sales and revenues and Biomet's net worth. Arguably, these are an imperfect measure of the financial condition of Electro-Biology itself, but the corporate and accounting structures of these companies make this evidence adequate to meet the requirements of the New Jersey Act. EBI Medical Systems is the sales and marketing subsidiary of Electro-Biology, a company that has no sales of its own. Moreover, Biomet did not maintain separate balance sheets that would document separate net worth calculations for its subsidiaries. Thus, the District Court did not err in permitting an award of punitive damages.

## 3. Excessive Damages

Finally, we consider EBI's contention that the punitive damages award is excessive. EBI not surprisingly relies on BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), the case in which the Supreme Court first struck an award of punitive damages as excessive under the Due Process Clause of the Fourteenth Amendment.

In that case, an Alabama purchaser of a new BMW automobile sued the manufacturer for its failure to notify him that his automobile had been repainted. Under BMW's policy, it sold unused but repaired cars as new unless the cost of the repair exceeded three percent of the car's

29

suggested retail price. It gave the purchasers, including plaintiff, no notification of the repainting because the cost of that repair did not meet the policy's minimum. The plaintiff claimed that the repainting impaired the car's value by approximately ten percent of the $40,000 price, or $4000 in actual damages, and introduced evidence that BMW had sold nearly one thousand repainted cars. The plaintiff argued that the appropriate penalty was $4 million. Id. at 563-64.

Alabama law permitted an award of punitive damages when a defendant engaged in "gross, oppressive or malicious fraud." Id. at 565. The jury concluded that BMW's nondisclosure policy constituted such fraud, and awarded both the requested actual damages and the $4 million in punitive damages. Id. The Alabama Supreme Court reduced the award to $2 million because the jury's calculation included sales in other jurisdictions; it upheld the award in all other respects. Id. at 566-67.

The Supreme Court reversed. The Court reaffirmed the states' traditional authority to punish and deter wrongdoers for acts committed within the jurisdiction, and noted that states have "considerable flexibility" in achieving those goals. Id. at 568. However, it cautioned that a state must avoid "grossly excessive" awards that "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." Id. Observing that"[e]lementary notions of fairness" require "fair notice" to a defendant of both the conduct punishable and the severity of the potential penalty, the Court identified three "guideposts" as indicia of the reasonableness of a punitive damages award: "the degree of reprehensibility of the [conduct]; the disparity between the harm or potential harm suffered . . . and [the] punitive damages award; and the difference between this [punitive] remedy and the civil penalties authorized or imposed in comparable cases." Id. at 574-75.

The Court considered the degree of reprehensibility to be "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Id. at 575. The Court observed that "some wrongs are more blameworthy than others" so that " `trickery and deceit' . . . are more reprehensible than negligence." Id. at 575-76. It

30

concluded that none of the aggravating factors were associated with BMW's conduct and observed that the plaintiff's injury was "purely economic in nature." Id. at 576. The Court stated that although intentional economic misconduct warrants punishment, particularly if inflicted on a financially weak and vulnerable entity, "this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." Id. Although punitive damages were warranted because BMW had intentionally omitted a material fact, the fact that the company also could have believed that it had no disclosure duty mitigated the egregiousness of the conduct.

"The second . . . indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." Id. at 580. The Court observed that it had looked to the ratio between the punitive and compensatory damages on other occasions. In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23–24 (1991), it had held that a four-to-one ratio did not "cross the line into the area of constitutional impropriety," and in TXO Production Corp. v. Alliance Resources, Corp., 509 U.S. 443, 460 (1996), it had held permissible a ratio that did not exceed ten to one once the potential harm to that plaintiff was taken into account. In considering the ratio guidepost, the Court observed that:

> [L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

BMW, 517 U.S. at 582.

In BMW, the Court followed its practice of declining to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Id. at 583 (citation

31

omitted). Rather, it stated that the concern should be for reasonableness. Id. In the case of the plaintiff purchaser of the BMW, the $2 million punitive damages award produced what the Court described as "a breathtaking 500 to 1" ratio between the penalty and plaintiff's actual damages, id. at 583, and was thirty-five times greater than the total damages of all fourteen Alabama purchasers, id. at 582 n.35.

Finally, in discussing the third indicium of excessiveness, a comparison of the punitive damages and the potential civil or criminal penalties for comparable misconduct, the Court reiterated its deference to legislative judgments regarding appropriate sanctions. Id. at 583 (citing approvingly Browning-Ferris Indus., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)). The appropriate comparison, the Court suggested, is between the statutorily authorized financial penalty (when there is no imprisonment) and the punitive damages award.

In explaining its decision to reverse the judgment on punitive damages and remand, the Court noted that BMW lacked any notice that its conduct, which would have given rise to a $2000 fine under the state's Deceptive Trade Practices Act, Ala. Code S 8-19-11(b) (1993), could result in a multimillion dollar penalty, and that there was no basis for assuming that BMW, which did change its policy, would not have done so after receiving a lesser sanction. Id. at 584-85. Even without drawing "a bright line marking the limits of a constitutionally acceptable punitive damages award," the Court was convinced that the award in BMW was "grossly excessive." Id. at 585.

The Supreme Court's decision in BMW provides us with an analytic framework to consider whether the now reduced $50 million punitive damages award remains excessive. In two recent cases, the Court of Appeals for the Tenth Circuit has applied the BMW criteria, concluding in both that the punitive damages awards were excessive even though not all three of the indicia of excessiveness identified by the Supreme Court were present. In Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d 634 (10th Cir. 1996), the jury awarded actual damages of $269,000 and

32

punitive damages of $30 million on claims of tortious interference with both prospective business advantage and contract. See id. at 635. Although the defendant was aware of the possibility of such a large award (one of the "guideposts"), the court of appeals directed a remittitur to $6 million because the harm inflicted by the defendant was purely economic in nature and the ratio between the compensatory and punitive damages was too high. Id. at 640–42. In FDIC v. Hamilton, 122 F.3d 854 (10th Cir. 1997), the court directed a reduction of punitive damages award from $1.2 million to $264,000 for similar reasons.

The Tenth Circuit's summary of the factors to be considered in determining the degree of reprehensibility of a defendant's conduct is useful: whether it "cause[d] economic rather than physical harm; would be considered unlawful in all states; involves repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target." Continental Trend Resources, 101 F.3d at 638; accord Hamilton, 122 F.3d at 861; see also Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996) (identifying presence of violence, deceit or malice and the repetition of conduct as aggravating factors in determining degree of reprehensibility).

Applying those factors, we note the harm inflicted on Orthofix was economic, rather than physical, and hence "less worthy of large punitive damages awards than torts inflicting injuries to health or safety." Continental Trend Resources, 101 F.3d at 638. It has been suggested that, "[w]hen the injury is economic, and particularly when it arises out of a contractual relationship where the parties can and should contractually protect themselves by providing for explicit remedies in the event of breach, the permissible ratio of punitive damages to actual damages should be relatively modest." Hamilton, 122 F.3d at 862. Relevant also is that Orthofix is not a financially weak or vulnerable target. Another factor that tends to mitigate the need for a high punitive damages award is the jury'sfinding that Orthofix itself breached the distributor agreement, failed to fill and ship EBI's legitimate orders, and engaged in tortious acts.

We recognize that the jury found, as instructed under New Jersey law, that EBI acted with either "actual malice" or "a wanton and willful disregard of persons who forseeably might be harmed," N.J. Stat. Ann. 2A:15-5.12(a), that EBI's plan "involved acts of deception and, at least, reckless disregard of the consequences to Orthofix," Inter Med. Supplies, 875 F. Supp. at 700, and that those acts continued over an extended period of time with full awareness of the harm to Orthofix, see N.J. Stat. Ann. S 2A:15-5.12(b).

Nonetheless, balancing these facts with respect to reprehensibility, we conclude that EBI's conduct, which inflicted only economic harm for which large compensatory damages have been awarded, was not sufficiently egregious to warrant a punitive damages award of $50 million. In this connection, we take into consideration that high, easily calculable compensatory damages may more appropriately be accompanied by a lower punitive damages ratio. See BMW, 517 U.S. at 582.

Finally, we find reference to the sanctions for comparable misconduct (the third guidepost) unhelpful here, as there is no clearly applicable reference point. EBI offers two potential comparisons. First, it suggests that the $50 million award here is higher even than the $30.5 million fine imposed for shipping adulterated medical devices that caused deaths, see United States v. C.R. Bard, Inc., 848 F. Supp. 287, 290 (D. Mass 1994), conduct far more egregious. Second, EBI notes that the potentialfine under the United States Sentencing Guidelines calculation to deprive a defendant of the profit from his wrongdoing would be only $500,000, which is 1/100 of the punitive damages award here. See U.S.S.G. SS 8C2.4(a), 8A1.2, comment (n.3(h)). Orthofix counters that federal and state laws contain numerous authorizations for treble damages when a defendant engages in unfair business conduct and competition. See, e.g., 15 U.S.C. S 15 (antitrust); 18 U.S.C. S 1964 (RICO); N.J. Stat. Ann. S 56:4-2 (unfair trade practices). However, even trebling $500,000 would significantly reduce the punitive damages award from the $50 million figure.

34

Because we have concluded that the punitive damages award should be reduced in light of the first guidepost, we need not decide between these competing statutory comparisons. We agree with the Tenth Circuit's observation that "a violation of common law tort duties [may] not lend [itself] to a comparison with statutory penalties. The fundamental question is whether [the defendant] had reasonable notice that its tortious interference with contracts and prospective business advantage could result in such a large punitive award." Continental Trend Resources, 101 F.3d at 641 (citing cases involving high punitive damages awards for tortious interference claims).

Once we have determined that a punitive damages award as high as that set here does not accord with the analysis recommended by the Supreme Court in BMW, we are left to fulfill our role as gatekeeper in reviewing an award of punitive damages. See Dunn, 1 F.3d at 1382. It is not an enviable task. We have searched vainly in the case law for a formula that would regularize this role, but have not found one. As we noted above, the Supreme Court has instructed as to the analysis but has provided nothing concrete as to the amount. Justice Kennedy's comments in his separate opinion in TXO reflect the frustration of many judges faced with the need to set a figure.

> To ask whether a particular award of punitive damages is grossly excessive begs the question: excessive in relation to what? The answer excessive in relation to the conduct of the tortfeasor may be correct, but it is unhelpful, for we are still bereft of any standard by which to compare the punishment to the malefaction that gave rise to it. A reviewing court employing this formulation comes close to relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution. This type of review, far from imposing meaningful, law-like restraints on jury excess, could become as fickle as the process it is designed to superintend.

TXO, 509 U.S. at 466-67 (Kennedy, J. concurring).

In the last analysis, an appellate panel, convinced that it

35

must reduce an award of punitive damages, must rely on its combined experience and judgment. When different members reach different figures, they must seek an accommodation among their views, a process that recurs throughout appellate decision making. After reviewing the record and the arguments in this case, we conclude that the proper, reasonable punitive damages award is no more than $1 million.6

In his passionate dissent, Judge Garth argues that we have ignored our precedent as to the standard of review applicable to a district court's ruling on punitive damages, which he asserts must be accorded "heightened deference," particularly if the district court has previously granted a remittitur. The brief passage in our 1992 opinion in Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992), to which he alludes, is not this court's latest writing on that issue. Instead, this court's 1993 opinion in Dunn, where we spoke en banc, represents our most recent and considered opinion on the issue of punitive damages, and particularly on punitive damages following a District Court remittitur. See Dunn, 1 F.3d at 1382–91.

In Dunn, we did not enunciate any rule of extraordinary deference to the district court's decision, as Judge Garth would have us adopt. Instead, although the district court there had reduced by remittitur the jury's punitive damages award from $25 million to $2 million (a considerably larger percentage reduction than that ordered by the District Court here), we nonetheless decided that an additional reduction was appropriate and reduced the already remitted damages from $2 million to $1 million. Id. at 1391. We stated that we were further reducing the punitive damages award because we believed that the "district court gave insufficient consideration to the effect of successive punitive awards in asbestos litigation." Id.

We discussed at great length this court's role in the assessment of punitive damages. Contrary to Judge Garth's

_____

6. Because of the extent to which we have reduced the punitive damages verdict, we need not address EBI's contention that the $50 million award is excessive because it constitutes 3.3 percent of Biomet's net worth, far above the one percent we allowed in Dunn, 1 F.3d at 1383.

position, the en banc court stated: "We cannot leave the amount of punitive damages solely to the trial court because it is evident to us that the Supreme Court in Haslip approved review by an appellate court to `determin[e] whether a particular award is greater than reasonably necessary to punish and deter.' " Dunn, 1 F.3d at 1385 (alterations in original).

Thus, notwithstanding the deference which we accord the trial court in such matters, and notwithstanding our commendation of "the district court's discipline in reducing the punitive damages from $25 million to $2 million," id. at 1391, we undertook to further reduce the punitive damages upon our determination "that further remittitur of the punitive damage award in this case is appropriate," id. In light of that further reduction, the dissent's insistence that Dunn is not relevant to the standard of review when a district court orders a remittitur is surprising. The dissent's attempt to confine Dunn to product liability cases is unpersuasive. Haslip, on which we relied in Dunn, was not a products liability case. This court's recent opinion, Hurley v. Atlantic City Police Dep't, 174 F.3d 95 (3d Cir. 1999), that was also not a products liability case, cited Dunn for its discussion and holding regarding punitive damages. Id. at 114.

The centerpiece of the dissent is its reliance on our pre-Dunn opinion in Keenan. The dissent fails to point out that notwithstanding the "super-deference" to the district court, which the dissent claims Keenan requires, in Keenan we reversed the punitive damages assessed against one of the defendants after finding that there was inadequate evidence to support their imposition. 983 F.2d at 471. Moreover, Keenan itself undermines the dissent's attempt to cabin damages in products liability cases in a separate category. Keenan relied for the standard of review for excessiveness on an earlier Third Circuit case, Gumbs v. Pueblo International, Inc., 823 F.2d 768 (3d Cir. 1987), where, again notwithstanding the deference owed to the district court since it granted a remittitur, we reversed the imposition of compensatory damages as excessive. The Gumbs court in discussing the standard of review, relied on an earlier Third Circuit decision, Murray v. Fairbanks

37

Morse, 610 F.2d 149 (3d Cir. 1979), which was a products liability case. See Gumbs, 823 F.2d at 771. It is thus evident that there is no basis to consider damages in products liability cases as a separate category, and we certainly did not so suggest in Dunn.

The dissent gives short shrift to Haslip, despite the fact that Haslip issued from the Supreme Court, because that opinion failed to satisfy Judge Garth's need for "a formulaic standard of review." I agree that our task as appellate judges in reviewing damages awards, whether or not there has been a remittitur, would be facilitated if there were a formula, but not all of our review function can be compressed into a formula, and the guideposts provided by the BMW opinion adequately serve that function.

The cases cited by Judge Garth and those that were relied upon in our earlier decision in Keenan  for the proposition that we owe heightened deference to the district court's remittitur decision -- Delli Santi v. CNA Insurance Cos., 88 F.3d 192 (3d Cir. 1996); Starceski v. Westinghouse Electric Corp., 54 F.3d 1089 (3d Cir. 1995); and Gumbs v. Pueblo International, Inc., 823 F.2d 768, 771-72 (3d Cir. 1987) -- were all compensatory damages cases and not punitive damages cases. In punitive damages cases we must be informed by the Supreme Court's jurisprudence and, as noted above, that jurisprudence counsels intensive review.

As we noted above, our decision in this case to reduce the punitive damages award even further is based upon the guideposts established by the Supreme Court. And, in the last analysis, we conclude that an award greater than $1 million is not "reasonably necessary to punish and deter." Haslip, 499 U.S. at 22.

III.

CONCLUSION

In conclusion, we will affirm the District Court's decision on all grounds raised in this appeal other than the punitive damages and will remand so that the District Court can

38

enter a judgment for punitive damages in the amount of $1 million.

GARTH, Circuit Judge, dissenting:

While I join the Court in its holdings on all of the substantive issues discussed in sections II.A through II.D of its opinion (with but one caveat stated in the margin),1 I am

_____

1. Each of the issues raised by EBI has been more than adequately explained and rejected by the majority opinion. However, I note that in one area, while I agree with the conclusion that the District Court's interpretation of Paragraph 6(d) of the parties' Distributor Agreement, containing the "in any way handle" clause precluded EBI from manufacturing or producing its own bone fixators during the course of the Agreement, I question whether the breadth of the majority's holding with respect to the District Court's charge truly represents the jurisprudence of this Circuit.

It must be remembered that the District Court had ruled, over EBI's objection, in an in limine proceeding that Orthofix's interpretation of the
"in any way handle" clause was correct, which then became the law of the case. At the conclusion of the trial, EBI submitted a proposed charge that affirmatively incorporated the District Court's interpretation of Paragraph 6(d), which the District Court adopted in all respects pertinent to this appeal. Once EBI had objected and presented arguments in support of its interpretation of Paragraph 6(d) at the in limine proceeding, I agree that thereafter EBI was not obliged to object to
the charge of the District Court, which incorporated its in limine ruling, in order to preserve the issue on appeal. See , e.g., Smith v. Borough of Wilkinsburg, 147 F.3d 272 (3d Cir. 1998). However, I cannot agree that when EBI submitted its own charge that parroted in essential respects (i.e., the interpretation of "in any way handle") the District Court's ruling,
that EBI could thereafter raise the issue on appeal, claiming that it had preserved the issue, especially when the District Court essentially adopted EBI's proposed charge.

I know of no case in our Circuit where the submission of a requested charge which was then adopted by the District Court would not foreclose the party requesting the charge from thereafter being bound by it. Hence, although it does not disturb the disposition reached by the majority affirming the District Court's interpretation of Paragraph 6(d) --
a disposition in which I join -- I do raise a question as to the expansiveness of the doctrine arguably embraced by the majority. It seems to me that our opinion would be far more in tune with our prior precedents were we to restrict ourselves to approving preservation of an issue only when the affected party had not in effect estopped itself by submitting a requested charge which affirmatively incorporated an adverse ruling.

obliged to write separately in dissent on the issue of
punitive damages.2

I.

I am compelled to disagree with the majority's reduction
of the punitive damages assessed against EBI not only
because that monetary reduction has no principled basis,
but also because the standard of review that this Court has
previously established and announced has been totally
ignored. See Keenan v. City of Philadelphia, 983 F.2d 459
(3d Cir. 1992). While Dunn v. HOVIC, 1 F.3d 1371 (3d Cir.
1993) (en banc), to which the majority refers, see Maj. Op.
at 36, dealt with punitive damages but only in a product
liability context, i.e., asbestos damage awards, Dunn did not
provide nor attempt to provide a standard of review that
contradicted or overruled Keenan. Indeed, Dunn did not
even cite to Keenan and the Dunn court, which was
concerned solely with due process considerations, explained
its result only in terms of successive and multiple damage
awards which asbestos product liability cases might
generate, a situation that obviously is not relevant in the
present case. Neither Dunn nor Pacific Mutual Life
Insurance Co. v. Haslip, 499 U.S. 1 (1991), on which the
majority relies in Dunn and which I discuss in Section III,
infra, bear on the standard of review. Instead, the majority
here has substituted its own discretion and judgment (see
Maj. Op. at 35-36) -- without warrant from precedent or
statutory authority -- for our announced standard of
review, and for that of the District Court, to whose
discretion and judgment we are bound to give a "super-"
deference, especially after a grant of remittitur. See also
Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93 (2d Cir.
1995) (reviewing decision to remit punitive damages under
abuse of discretion standard; punitive award must"shock
to conscience" to warrant reversal); Hiltgen v. Sumrall, 47
F.3d 695 (5th Cir. 1995) (reviewing remittitur under
"considerable deference" standard).

_____

2. Punitive damages are discussed by the majority in Section II.E of its
opinion.

41

Struggle as it might, the majority opinion still cannot explain why it fails to follow the controlling standard of review set forth in Keenan. See Maj. Op. at 37. The majority has sought to gloss over the significant differences between product liability cases, whose reductions of punitive damages awards stem from the fear of multiple and successive punitive awards, and cases such as this one where no such circumstances obtain. Moreover, the majority has not acknowledged that the cases on which it relies are fundamentally different from this case, in that those cases, such as Haslip and Dunn, were not concerned, as we are, with the standard of review, but rather were focussed on due process considerations.

Nor is the majority on sound ground when it points out that those cases that relied upon our Keenan standard of review did not uphold the district court's remittiturs. All that argument demonstrates is that the evidence in those cases -- Gumbs and Keenan -- did not satisfy our heightened standard of review.[3] In this case, Judge Orlofsky's discretion, based on the overwhelming evidence and the jury's 22 special verdict findings, more than satisfied that standard. Ergo, our decision should have been to affirm rather than to try to explain away what cannot be explained.

I recognize that the amounts of money involved are extremely substantial, and that even the least of those amounts is very significant. A reduction from $100,600,000 jury verdict to a $50,000,000 remittitur award to the $1,000,000 majority award (without principled explanation or analysis) is eyebrow-raising. Even if I, like the majority, wanted to reduce the jury's award or Judge Orlofsky's remittitur because of their respective sizes, I could not bring myself to do so because no principled basis exists for such a dramatic reduction. I note also that it was because of the amount of punitive damages as well as our own desire to arrive at a principled formula for their

_____

3. Of course, insofar as Gumbs was decided before Keenan, it did not have the benefit of the fully-enunciated and controlling standard established by Keenan, which in turn relied in part, and expanded upon Gumbs.

42

ascertainment -- a task at which the majority has not succeeded -- that we devoted most of the time allotted at oral argument to that subject.

However, we should not and cannot be swayed by the dollar amount of the damages if the ultimate decision at which we arrive is a principled decision that respects the standard of review by which we are bound. Justice Frankfurter in Rochin v. California, 342 U.S. 165, 170 (1952) expressed it succinctly when he stated: "We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function." Our judicial function, as I perceive it, is to adhere to our announced standard of review until it is overturned by our entire Court or by the Supreme Court.

Thus, my primary focus in this dissent deals with the standard by which we must review the District Court's remittitur order. It is that standard which dictates the result I have reached and which gives rise to the flawed majority opinion respecting punitive damages. My secondary focus centers on the manner by which the majority has reduced Judge Orlofsky's remittitur in derogation of precedent and our standard of review.

Therefore, while I agree with the majority's disposition on all other issues, I respectfully dissent from the majority opinion as to the amount of punitive damages to which Orthofix is entitled. Rather, pursuant to our standard of review, I would affirm the District Court's remittitur of $50,000,000.

II.

This Court's review of a District Court's punitive damage remittitur is remarkably circumscribed and consists of three elements. We have held that when examining the excessiveness of a punitive damages award, our review "is [1] severely limited: [2] we may . . . reverse and grant a new trial only if the verdict is so grossly excessive as to shock the judicial conscience. [3] Where the district judge grants a remittitur, deference to the trial court is heightened. Our review requires additional deference to the district court since it already granted a remittitur." Keenan, 983 F.2d at

43

472 (internal quotations and citations omitted, and brackets and emphasis added). Dunn is not to the contrary, because as I have pointed out, Dunn is a due process/product liability case and it leaves intact the standard of review which Keenan announced when a district court orders a remittitur. Thus, because the trial judge is in the best position to oversee whether the jury verdict is rationally based, when the trial judge grants a remittitur this Court will not reverse unless wefind the District Court abused its discretion when measured against our standard of "heightened deference." Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 771-72 (3d Cir. 1987). See also Kazan v. Wolinski, 721 F.2d 911 (3d Cir. 1983). Cf. Delli Santi v. CNA Ins. Cos., 88 F.3d 192 (3d Cir. 1996); Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995).

Here, the jury awarded Orthofix $100,600,000 in punitive damages, a figure it evidently derived from evidence in the record indicating that Biomet's cash on hand for the 1996 fiscal year was approximately $100,600,000. The District Court reduced this amount to $50,000,000 in its remittitur order, apparently to bring the award in line with the compensatory damages of $48,000,000 proven at trial and found by the jury. The District Court, which, as the majority notes, was "intimately familiar with the case and the evidence," Maj. Op. at 24, had been involved with the litigation for over three years (including a two month trial) and in its discretion had equated the punitive damages to the compensatory damages on a 1:1 ratio.

Despite this exercise of the District Court's discretion, a discretion that the majority has found not to have been abused or to have "shocked the judicial conscience" -- indeed, without any principled basis at all, with no reference to the record, and in utter disregard of our standard of review, the majority has further reduced the punitive damages from $50,000,000 to $1,000,000. Nor has the majority made any reference in its opinion to the "heightened deference" that we owe to the District Court when it has granted a remittitur.

The analysis provided by the majority to support its peremptory reduction of 98% (based on a reduction to

44

$1,000,000) of the remitted punitive damages award is unprecedented in this Circuit. While the majority was correct in rejecting EBI's arguments for reduction based upon the "alleged passion or prejudice" of the jury, Maj. Op. at 28, the majority nonetheless has arbitrarily reduced the punitive damages award based only upon its interpretation of the "guideposts" found in BMW of North America v. Gore, 517 U.S. 559 (1996), and two Tenth Circuit cases that have sought to explain them, FDIC v. Hamilton, 122 F.3d 854 (10th Cir. 1997) and Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d 634 (10th Cir. 1996), cert. denied, 520 U.S. 1241 (1997), as well as Dunn, 1 F.3d 1371.4

Specifically, the majority concludes that, based upon factors mentioned in those cases, "EBI's conduct, which inflicted only economic harm for which large compensatory damages have been awarded, was not sufficiently egregious to warrant a punitive damages award of $50 million." Maj. Op. at 34. I am hard pressed to understand that conclusion in light of the jury findings of egregious, intentional and deceitful behavior by EBI, and by the lack of record evidence in the majority opinion which could shore up such a reduced award.

The jury, in its responses on the special verdict sheet, answered that it had found by a preponderance of the evidence: that EBI intentionally and improperly interfered with Orthofix's reasonable expectations of economic advantage; that EBI wrongfully and intentionally interfered in the contractual relations between Orthofix and Inter Medical; that EBI made false statements either knowingly, recklessly or negligently that injured Orthofix; that EBI's conduct in "passing off" its own products as those of Orthofix was likely to cause confusion as to the source of those products; that EBI made false statements that deceived or were likely to deceive, in violation of the Lanham Act and to the likely detriment to Orthofix; that EBI had uttered injurious falsehoods in violation of the

_____

4. As I have earlier indicated, I believe the majority's reference to and reliance on Dunn is inapposite, as Dunn did not disturb our standard of review of remitted punitive damage awards in a non-due process/non-product liability context.

45

Lanham Act; and that EBI competed unfairly in violation of New Jersey statutory and common law. The jury further found by clear and convincing evidence that Orthofix had suffered harm as a result of EBI's actions and that EBI's conduct was actuated by "actual malice or were accompanied by a wanton and willful disregard" of those who foreseeably would be harmed by its conduct.

Yet, despite these extraordinary findings, and despite the lack of evidentiary support, the majority relies on only one aspect of the element of "reprehensibility" 5 in deciding to reduce the District Court's remittitur: its conclusion that the damages inflicted by EBI were economic in nature. Maj. Op. at 33–34. I discuss this aspect of the majority opinion in section IV of this dissent, after noting the majority's failure to recognize and apply the Third Circuit standard of review pertaining to a punitive damages remittitur.

III.

I find fault with the majority opinion because, as I have already pointed out, the majority opinion has neglected either to state or to apply the standard of review relating to punitive damages. See Keenan, 983 F.2d at 472. I have recited our standard in the earlier portion of this dissent as review that is: 1) extremely limited with reference to the District Court's discretion; 2) subject to a "shock the conscience" scrutiny; and 3) characterized by a "heightened deference" when a remittitur has been granted, as there was here.

The majority opinion, in referring to our en banc decision in Dunn, which involved the due process impact of multiple and successive awards of punitive damages in asbestos–

_____

5. Although BMW is not on point with this case and is therefore distinguishable, it nonetheless specifies three guideposts for courts to consider in the punitive damages area. First and foremost is the egregiousness of the defendant's conduct, i.e., deceit, fraud, etc., labeled "the degree of reprehensibility." BMW, 517 U.S. at 575. Second, is the ratio of punitive damages to "the actual harm inflicted on the plaintiff." Id. at 580. The third and final guidepost is a comparison to sanctions for comparable misconduct. Id. at 583. I agree with the majority that his third guidepost is not relevant to this appeal. Maj. Op. at 34.

related injury cases, did not specify the standard of our review of a District Court's judgment. The nearest Dunn came to enunciating such a standard was its reference to the Supreme Court's decision in Haslip, 499 U.S. 1 (1991). Haslip stated that an appellate court should determine whether a particular award is "greater than reasonably necessary to punish and deter" -- hardly a formulaic standard of review. See Dunn, 1 F.3d at 1385 (quoting Haslip, 499 U.S. at 19). That same rubric is repeated by the majority in this case. See Maj. Op. at 37 & 38. Significantly, however, just as Haslip provides no analysis to determine whether a particular award is "greater than reasonably necessary to punish and deter," neither does the majority here give us the benefit of its analysis and wisdom when it concludes (in citing Haslip) that any award larger than $1,000,000 is not "reasonably necessary to punish and deter." Maj. Op. at 38 (citing Haslip, 499 U.S. at 19)).

Hence, I emphasize and maintain that neither Haslip nor Dunn6 has superseded this court's prescription held in Keenan, providing the appropriate standard of review after a remittitur has been ordered. This is particularly so, since there has been no endeavor on the part of the majority even to acknowledge the specific findings made by the jury and to analyze the District Court's opinion. That opinion discussed at length the factors to be given consideration under the New Jersey Punitive Damages Act.7

_____

6. Dunn, of course, involved Virgin Islands common law, whereas the instant appeal is rooted in New Jersey statutory law, which governs the ultimate punitive damages award.

7. The New Jersey Punitive Damages Act, among other provisions, provides that a jury may award up to 5 times the compensatory damages or $350,000, whichever is greater. N.J.S.A. 2A:15-5.14b. The Act is careful to circumscribe the essentials for a punitive damage award. It requires that the plaintiff prove, by clear and convincing evidence, that the harms alleged were caused by the defendant's acts or omissions, and that these acts or omissions were "actuated by actual malice or accompanied by a wanton and willful disregard" for those who might be harmed. N.J.S.A. 2A:15-5.12a. In this case, the jury's special verdict findings met each and every requirement of the Act. Hence, the jury's punitive damage award could have exceeded even its $100,600,000 punitive damages award if it had multiplied the $48,000,000 compensatory damages award by 5. As we note in text, infra, and note 8, infra, the District Court, in reducing the punitive damage, fully addressed all elements of the Act. See N.J.S.A. 2A:15-5.12b.

47

Nor does the majority acknowledge that Haslip obviously informed this court's decision in Keenan. Haslip was decided in 1991. Keenan was decided a year later, in 1992, and Haslip was the subject of discussion in Judge Higginbotham's separate opinion. Accordingly, the majority's reliance on Haslip has little to do with its lack of reliance on Keenan. Further, Keenan's standard of review has obviously survived even in light of Dunn because as mentioned Dunn has no relevance to the instant appeal. As noted, Dunn was a product liability case concerned with the implications of multiple and successive punitive damage awards as they are affected by principles of due process, which explains Dunn's reliance on Haslip . Haslip also concerned the due process implications of punitive damage awards. 499 U.S. at 18.

A more pertinent precedent -- cited in passing by the majority, see Maj. Op. at 28 -- is Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989), which affirmed a punitive award of $6,066,082.74 and a compensatory award of $51,146, a ratio of approximately 12:1. In so holding, the Supreme Court prescribed that in reviewing a district court's decision whether to order a new trial on the issue of punitive damages, an appellate court has a "limited function" and affirmed the principle that appellate court should "continue to accord considerable deference" to the district courts. 257 U.S. at 279. Undoubtedly, this prescription underlay the adoption by our court of the Keenan standard of review.

One appellate court has characterized a jury verdict that would "shock the conscience" as one that was so large as to be contrary to reason, or so exaggerated as to demonstrate the existence of bias or some other improper motive. Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983). Here, however, the majority does not hold that either the original jury award or the remitted award was so large as to be contrary to reason, nor could it. The defendants collectively are entities worth over $1 billion dollars, and a $50 million punitive damages award cannot be deemed unreasonable. Moreover, the majority explicitly holds that prejudice or bias was not a factor in the award. Maj. Op. at 28. Nor has the majority held (as I

48

suggest it cannot in light of the record) that the District Court abused its discretion. Indeed, in its remittitur opinion, dated August 28, 1997, the District Court identified and discussed at length the seven factors required by New Jersey law in assessing whether the amount of a punitive damage award was reasonable. [8] Despite the dictates of our limited standard of review, at no point does the majority opinion even discuss this analysis by the District Court, nor explain how it believes the District Court abused its discretion.

Having failed to explain and having failed to hold that the District Court abused its discretion, or that the award "shocked the judicial conscience," and having failed to give any deference, let alone "heightened deference" to the District Court's remittitur, it is evident that the majority has also failed to adhere to this Court's established standard of review, and has consequently erred in its decision.

IV.

The majority's arbitrary reduction in punitive damages to $1,000,000 is not justified by the evidence and is without any basis in principle or precedent. Moreover, the authorities to which the majority has looked for guidance, argue instead for affirming the District Court's remittitur. Indeed, no case cited by the majority has held definitively that cases involving only economic controversies warrant a lower punitive damages award than those involving non-economic damages such as threats to public health.

While the BMW Court suggested that economic harm alone is not normally associated with "particularly reprehensible conduct," 517 U.S. at 576, that is only one element of the "reprehensibility" analysis. See Continental

_____

8. The District Court considered the following: 1) the likelihood of serious
harm resulting from EBI's misconduct; 2) EBI's awareness or reckless disregard of that likelihood; 3) EBI's conduct upon learning that their initial misconduct would likely cause harm; 4) the duration or any concealment of the misconduct; 5) the profitability of the misconduct; 6) when the misconduct was terminated; and 7) EBI'sfinancial condition.

Trend Resources, 101 F.3d at 638; Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996) (listing other elements). The other elements which must be taken into account, such as intentionality, repetitive conduct, and conduct involving deliberate false statements, etc., were all found by the jury to have occurred in this case.

However, evidence produced at trial, but not mentioned in the majority opinion, indicated that EBI's conduct could involve potential physical harm to the wider community as well as economic harm. EBI was found liable for passing off its own products as those of Orthofix, a recognized and respected manufacturer of bone fixators. There is evidence in the record that on at least one occasion, the deceptive substitution of EBI bone screws and ankle clamps for use in conjunction with Orthofix fixators could have injured patients. Therefore, the jury could well have concluded that the deceptive practices engaged in by EBI not only caused economic damage to Orthofix, but also exposed orthopedic patients to increased harm, to say nothing of the liability of hospitals when they unknowingly used EBI's bone screws and clamps believing them to have been manufactured by Orthofix. Even if this evidence is disregarded-- as the majority disregards it -- and even if one focuses only on the economic aspects of the damages caused by EBI, this Court must still affirm by deferring to the District Court's remittitur.

As mentioned, EBI was found to have engaged in a series of continuous and intentional deceptive acts in order to steal a market from Orthofix worth approximately $95 million. This evidence, which the majority credits, Maj. Op. at 33-34, is more than sufficient to justify the jury's finding of reprehensible conduct, which is the "most important indicium" among the guideposts.9 BMW, 517 U.S. at 575. See also note 5, supra. That finding distinguishes this case from BMW in which the Supreme Court found "none of the

_____

9. Indeed, the majority concedes that the full award of compensatory damages can be credited to EBI's tortious conduct: "[t]he breaches of contract here were so intertwined with the tortious scheme to steal Orthofix's market that the full award is properly attributable to the tortious conduct." Maj. Op. at 27.

aggravating factors" associated with reprehensible conduct. 517 U.S. at 576. Indeed, the Supreme Court in BMW indicated that cases involving such deceptive conduct would justify a high punitive award. 517 U.S. at 576 ("[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct . . . can warrant a substantial penalty"). Cf. Balsamides v. Perle, 712 A.2d 673, 685 (N.J. App. Div.) (stating punitive damages can be awarded for breach of contract in commercial dispute where there has been a "breach of trust beyond the contractual breach"), certif. granted, 719 A.2d 1023 (N.J. 1998).

The specific cases relied upon by the majority do not support its holding that economic damages alone justify a lowering of a punitive damages award. While the Tenth Circuit in Continental Trend Resources and Hamilton did discuss the economic nature of the damages, the holdings of those cases were far more concerned with the constitutionality of the ratio of punitive damages to compensatory damages -- another of BMW's "guideposts." See BMW, 517 U.S. at 580.

The majority understandably does not dwell on the ratio of the jury's compensatory damages award of $48,000,000 to its proposed punitive damage award of $1,000,000. It makes no such comparison because in each of the cases cited, the punitive damages were far greater than the compensatory damages. BMW, which focussed on the ratio between punitive damages and compensatory damages, implicitly assumed the former would be higher than the latter in most cases. 517 U.S. at 580-82. Under the majority's approach here, the opposite is true and the majority's reliance upon BMW suffers because of that fact.

On the other hand, Judge Orlofsky's remittitur of $50,000,000, which I would affirm, when compared to the compensatory damages of $48,000,000, is essentially a 1:1 ratio, and well within the guidepost of BMW. The District Court's remittitur ratio is also a far more acceptable ratio than even the 6:1 ratio found to be permissible by the Tenth Circuit, or the 4:1 ratio affirmed in Haslip. See Hamilton, 122 F.3d at 862; Continental Trend Resources, 101 F.3d at 643. Indeed, the Supreme Court has intimated

51

that the ratio of punitive damages to compensatory damages could be even higher than 6:1 in economic damages cases taking into account the damages that would have accrued had the defendant succeeded in its egregious conduct. BMW, 517 U.S. at 581 (approving a 10:1 ratio in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993) and stating that punitive damages should be assessed in the context of harm that was likely to occur as well as harm that did occur)). See also Browning-Ferris, 492 U.S. 257 (12:1); Watkins v. Lundell, 169 F.3d 540 (8th Cir. 1999) (4:1 ratio); Neibel v. Trans World Assurance Co., 108 F.3d 1123 (9th Cir. 1997) (6:1 ratio).

V.

Finally, I take issue with the standard against which the majority measured its award of punitive damages. The majority standard, rather than relying on our standard of review, alarmingly requires instead that an appellate panel "must rely on its combined experience and judgment" when reducing a remittitur. Maj. Op. at 36. The majority therefore, consonant only with its own devised standard and with reference only to its own judgment, holds, in conclusory fashion, that "[a]fter reviewing the record and the arguments in this case, we conclude that the proper, reasonable punitive damages award is no more than $1 million." Maj. Op. at 36. Any amount greater than that, the majority concludes, would not be "reasonably necessary to punish and deter." Maj. Op. at 38. As I have indicated, no analysis accompanies this ipse dixit conclusion.

Not only does this mysterious and unauthorized standard provide no instruction to the trial courts or litigants, but, as I have discussed above, it totally ignores our precedential standard of review, announced in Keenan, 983 F.2d 459, under which we are obligated to give additional deference to the district court's experience and judgment except where the award shocks the conscience or when the district court has abused its discretion. Here, the majority has followed its own "merely personal and private judgment" in arriving at a proper amount of punitive damages, rather than confining itself to "the limits that

52

bind judges in their judicial function." See Rochin, 342 U.S. at 170.

VI.

I acknowledge that punitive damages continue to be a problem vexing both the state and federal courts. See Milo Geyelin, Philip Morris Hit with Record Damages , WALL ST. J., March 31, 1999, at A3 (reporting punitive damage award of $80.3 million); Milo Geyelin, Jury Awards $50 Million to Ex-Smoker, WALL ST. J., Feb. 11, 1999, at A3 ($51.5 million). Yet, neither the state nor federal courts have fashioned a sure-fire recipe to solve the question of "how much,"[10] even though we have prescribed a formula -- our standard of review -- to be employed.

Nevertheless, a Court of Appeals cannot "willy-nilly," in an effort to reach what it considers to be the "right figure," arbitrarily pull a punitive damage award from the air as if it were a lottery number and announce "in our judgment," this is it! I feel strongly that a court of review, such as we are, must not only furnish guidelines to the bench and bar, but even more importantly, it must set an example of correct judicial behavior by adhering to announced principles of jurisprudence. To do so, it must remain "within the limits that bind judges in their judicial function." See Rochin, 342 U.S. at 170. Failure to do so can lead only to arbitrary, capricious and/or emotional judgments beyond the realm of principle.

In this case, I believe the majority's decision, excellent in all other respects, has failed to adhere to its proper judicial function when speaking to the issue of punitive damages. It has failed to recognize what the court must regard as our declared standard of review -- see Keenan, Gumbs, Delli Santi, Starceski, supra, etc. At the very least, the majority opinion has now added confusion to this court's standard

_____

10. In an effort to alleviate this problem, New Jersey, and recently Alabama, have joined a growing number of states which have responded with legislation governing the award of punitive damages. See BMW, 517 U.S. at 614-16 (Ginsburg, J., dissenting) (listing in appendix state statutes governing punitive damage awards).

by referring to a "standard" derived from inapposite cases which pre-existed Keenan. It has substituted its personal judgment for a principled review function over a District Court's discretion; and without relying on record evidence, it has reached a bottom line "lottery" figure of $1,000,000 relying only on its own "experience and judgment." Maj. Op. at 36. Such a practice is neither principled jurisprudence nor is it Third Circuit jurisprudence. If the majority now holds that, in light of the sequence of cases -- Haslip in 1991, Keenan in 1992, and Dunn in 1993 -- and in light of the materially different contexts of these cases, that our remittitur standard of review has now been whittled down so that no analysis aside from an ad hoc panel's "combined experience and judgment" is required in reviewing a district court's remittitur, then all the more reason why this court must address and resolve this confusion by establishing firm guidelines.

Accordingly, I respectfully dissent from the standard of review and the resulting punitive damage award announced by the majority. Instead, I would affirm the District Court's remittitur of $50,000,000.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

54